UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                        )
UNITED STATES OF AMERICA,          )
                                                        )
        v.                                        )
                                                        )        Criminal No. 05-10125-WGY
MARY LEMPITSKI,                            )
                                                        )
        Defendant.                         )
_____)


## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Mary E. Lempitski (the "Defendant" or "Ms. Lempitski"), by and through her undersigned counsel, hereby submits this Memorandum in connection with the sentencing proceeding in the above-captioned matter which is currently scheduled for May 11, 2006, at 2 p.m.  As explained in greater detail below, the Defendant contends that the appropriate sentence in this case, after consideration of all of the applicable factors identified in 18 U.S.C. § 3553, would a sentence of five (5) months imprisonment and five (5) months of home detention.  Such a sentence not only comports with a properly calculated sentencing guideline range that is applicable to facts of this case (see infra Section I), it is also particularly appropriate in light of the facts and circumstances of this case and the personal history and characteristics of the defendant.  See 18 U.S.C. § 3553)(a)(1).  Moreover, such a sentence is "sufficient, but not greater than necessary" to comply with the various sentencing purposes set forth in 18 U.S.C. § 3553(a)(2).  Id.

**I.**

## THE PRESENTENCE REPORT'S PROPOSED SENTENCING GUIDELINES RANGE IS NOT SUPPORTED BY SUFFICIENT EVIDENCE

The Presentence Report (the "PSR") in this case calculates a final adjusted offense level of 13. See PSR ¶ 71. This final offense level is based primarily upon the PSR's acceptance of the United States' contention that the total tax loss at issue in this case is $97,371 and is therefore between $80,000 and $200,000. See id. ¶ 63. As explained in her objections to the PSR, Defendant disputes this conclusion on a variety of grounds, and contends instead that the applicable tax loss is between $30,000 and $80,000, resulting in a final offense level of 12. See PSR at 49-50 (Defendant's Objections #25-28). In essence, the Defendant disputes the United States' contention that it has satisfied its heavy burden of proving the total tax loss in this case. Accordingly, to the extent that this Court considers the applicable Sentencing Guideline range under 18 U.S.C. § 3553(a)(4), it should consider the kinds of sentences and the sentencing range established for defendants with a final offense level of 12.

The United States' claim that the tax loss in this case exceeds $80,000 is based primarily upon its apparent use of a "cash expenditures" theory of prosecution in this case. Essentially, the United States has treated 100% of the Defendant's excess cash expenditures during the 2000 through 2003 period as being "unreported income." It has then proceeded to allocate all of that supposed unreported income to each of the years in which that alleged income was spent in order to determine a total tax loss. According to the government (and the PSR), that total tax loss is $97,371. See PSR ¶ 63.

As explained below, the United States' position regarding the tax loss in this case is deeply flawed. First and foremost, the United States has ignored significant and controlling caselaw requiring it to account for the "contribution which beginning resources or a diminution

of resources over time could have made to [the Defendant's] expenditures." Taglianetti v. United States, 398 F.2d 558, 562 (1st Cir. 1968). Instead, the United States erroneously presumes that every single penny of the alleged excess expenditures represents unreported income—with absolutely no consideration given to any of the Defendant's "beginning resources" or any "diminution" of her resources over the relevant period. Second, the United States has assumed—without sufficient evidence to support its claim—that 100% of the money used for these expenses constitutes taxable "income." Again, that assumption ignores the evidentiary burdens established by a litany of cases involving "cash expenditure" prosecutions. Third, assuming _arguendo_ that some portion of the alleged expenditures reflect income, the United States takes the erroneous position—also unsupported by the evidence—that that income is taxable during the year in which the money was spent. Fourth, the United States' position conveniently ignores evidence relating to the Defendants' possession of a pre-existing cash hoard—evidence which was disclosed in any untimely fashion to defense counsel, but which necessarily affects the possible tax loss in this case. Finally, the United States' calculations include certain alleged cash expenditures by the Defendant for which there is insufficient evidence.

A.    **The United States Has Failed to Establish Ms. Lempitski's Opening Net Worth in 2000 With Any Reasonable Certainty.**

The United States in this case has proceeded on a "cash expenditures" theory. As the Court of Appeals for the First Circuit has explained, a "cash expenditures" theory is a "variant of the net worth method of establishing unreported taxable income." See Taglianetti v. United States, 398 F.2d 558, 562 (1st Cir. 1968). This theory of prosecution is "devised to reach [a taxpayer] by establishing the amount of [her] purchases of goods and services which are not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during

the year.  Id. at 563 (emphasis added); see also United States v. Sutherland, 929 F.2d 765, 780 (1st Cir. 1991) (explaining that the expenditures theory requires, inter alia, that the government "demonstrate that the [defendant's] expenditures did not result from cash on hand, or the conversion of assets on hand at the beginning of the period"); accord United States v. Caserta, 199 F.2d 905, 907 (3d Cir. 1952) (explaining that the cash expenditure method "starts with an appraisal of the taxpayer's net worth situation at the beginning of the period").

The significant burden upon the government in a cash expenditures prosecution is based upon, and derived from, the Supreme Court's decision in Holland v. United States, 348 U.S. 121 (1955).  While the Court in that case approved the use of net worth approaches to tax prosecutions, it recognized the "general problems implicit in this type of litigation," and that such prosecutions are "fraught with danger."  Id. at 125.  Accordingly, the Court explained that this approach to tax prosecutions "require[s] the exercise of great care and restraint" and that "[t]rial courts should approach these cases in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute."  Id. at 132.  The Holland Court therefore imposed some special burdens on the government in such cases, including the requirement that the government establish proof of the taxpayer's opening net worth, id. at 134, a requirement that the government investigate leads which tend to diminish the taxpayer's potential culpability, id. at 135, and a duty to ensure that any net worth increases are attributable to currently taxable income.  Id.; accord United States v. Hall, 650 F.2d 994, 999-1000 (9th Cir. 1981) ("When choosing to proceed against a defendant using the net worth or bank deposits methods of proof, the Government assumes a special responsibility of thoroughness and particularity in its investigation and presentation.").

While the government's burden to establish an opening net worth in a cash expenditures case is somewhat different than its burden in a classic "net worth" case, see Taglianetti, 398 F.2d at 565, [1] the First Circuit still requires that government's evidence "make[] clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to [the Defendant's] expenditures." See Taglianetti, 398 F.2d at 562 (emphasis added); accord Sutherland, 929 F.2d at 780. Numerous other courts of appeals have echoed this requirement. See United States v. Mounkes, 204 F.3d 1024, 1028 (10th Cir. 2000) ("[T]o distinguish between unreported, taxable income and those deposits and expenditures not derived from taxable income, the government still must establish the defendants' pre-income 'cash on hand' with reasonable certainty"); United States v. Conaway, 11 F.3d 40, 44 (5th Cir. 1993) (explaining that the government "must establish the defendant's cash on hand at the beginning of each of the disputed years with reasonable certainty"); United States v. Cruz, 993 F.2d 164, 168 (8th Cir. 1993) (requiring that any available resources at beginning of period be "identified and quantified"); United States v. Pinto, 838 F.2d 426, 432 (10th Cir. 1988) (same); United States v. Marrinson, 832 F.2d 1465, 1469 (1st Cir. 1987) (following Taglianetti and explaining that the government "must establish beginning and ending net worth positions 'with sufficient particularity to rule out or account for the use of the taxpayer's capital to pay for his purchases'"). Indeed, the United States Department of Justice has itself acknowledges that it bears this burden when it pursues an "expenditures"-based prosecution. See United States Department of Justice, Criminal Tax Manual, http://www.usdoj.gov/tax/readingroom/

---

[1] Taglianetti explains that in a classic net worth case, "precise figures would have to be attached to opening and closing net worth positions for each of the taxable years." This rule is rooted in the Supreme Court's decision in Holland, 348 U.S. at 132 (requiring "the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets").

criminal/titlepg.htm (hereinafter "DOJ Tax Manual") § 32.02 (explaining that "in an expenditures case, the government must . . . [e]stablish an opening net worth with reasonable certainty and demonstrate that the taxpayer's expenditures did not result from cash on hand, or the conversion of assets on hand at the beginning of the period").

In this case, the government's evidence and its calculations—as submitted to the United States Probation Office and the Defendant—fail to account for or consider any contribution which the Defendant's beginning resources in January 2000 or the diminution of her resources over the 2000 through 2003 period may have made to her expenditures during the relevant period. Indeed, the government's position simply assumes—without any explanation—that the contribution of any "beginning resources" was zero. Under Taglianetti and its progeny, this approach is presumptively invalid.

This total absence of evidence regarding the contribution of any "beginning resources" for the Defendant is particularly glaring in several respects. First, as the government itself appears to acknowledge, the records relating to the Lempitskis' joint bank account at Framingham Cooperative Bank as well as Ms. Lempitski's account at the MBTA Credit Union are incomplete. See Government Memorandum to Probation of February 2, 2006 at 6-7 (failing to account for 2000 and earlier years and indicating that copies of numerous checks from that account were illegible); see also Government Memo of May 4, 2006 to Probation Office at 8 ("The detailed bank statements for Lempitski's account at the MBTA Credit Union do not include all of calendar year 2000."). Accordingly, the United States has necessarily failed to account for any amounts contributed by those accounts to any of the cash expenditures in question. For example, any checks made out to cash or to either of the Lempitskis might reasonably have been converted to cash. Without clearer records relating to these accounts, it is

simply impossible to determine the full amount of any contribution made by these accounts to any of the expenditures alleged by the government.

Second, the government's evidence completely omits one of the bank accounts that the Lempitskis admittedly drew upon as a source of cash during the 1997-2001 period.   Specifically, Ms. Lempitski's ex-husband has testified that he regularly withdrew cash from an account that he held with the Massachusetts Turnpike Credit Union.  See Testimony of Paul Lempitski at 10-10 ("I had [an account] at my credit union, [the] Turnpike's credit union.").  Mr. Lempitski also testified that he regularly shared cash (including cash from that account) with the Defendant. See Lempitski at 11-12 ("If I needed $100, I'd take $100.  She'd need 40 bucks, I'd give her the 40 bucks and go back to the bank the next day.").  Despite this testimony, the government never mentions this additional bank account in its memorandum to the Probation Office, has produced no records of this additional bank account to undersigned counsel, and appears simply to presume—contrary to Mr. Lempitski's testimony—that the contribution of this account to any of the cash expenditures is zero.  Again, such an approach is improper under Taglianetti.

Third, as the evidence provided to the Probation Office shows, the Lempitskis had a regular practice of keeping and maintaining a cash hoard in their home.  Mr. Lempitski testified that, during their marriage, they would regularly "squirrel away some . . . cash around the house."  See Lempitski at 21.  This money was typically kept "[i]n one of the dresser drawers" at their marital home to which the Defendant had access.  Id. at 22-23.  The failure to even consider cash hoard (which, according to Mr. Lempitski, grew at times to be as large as $3,000, see id. at 25) is symptomatic of the government's lackadaisical approach to satisfying its heavy burden in

connection with this proceeding.[2]  Instead of attempting to satisfy that burden, the government simply appears to have completely ignored this amount and assumed that every penny of the Defendant's cash expenditures were made with unreported income.[3]  That approach is simply wrong.  See also Taglianetti, 398 F.2d at 563.

Finally, the government appears to have made no effort to determine whether there was any diminution of the Defendant's resources over the period.  While Defendant admittedly purchased a significant amount of consumer goods during that period, the government has made absolutely no effort to ascertain and calculate whether any diminution of those goods during the relevant period may have contributed to any of the challenged expenditures.  But see PSR 35 (government relying upon Defendant's 2001 financial affidavit which appears to indicate that Defendant no longer possess many of the items allegedly purchased by the Defendant in 2000 and 2001).  This absence of evidence is alone sufficient to invalidate the government's tax loss calculations.

For all these reasons, the government's expenditure-based calculations are insufficient as a matter of law to support their contention that the tax loss in this case exceeds $80,000.  Indeed, because the evidence in this case is unclear about the precise amount of the tax loss, the Court should accept the tax loss range to which the Defendant has agreed to stipulate ($30,000 to $80,000).  See PSR at 48.

---

[2] Indeed, this smaller cash hoard may alone account for the approximately $2000 to $3000 of cash expenditures included in the government's calculations from the first half of 2000.

[3] Mr. Lempitski also testified about gifts and other amounts that were received and maintained by the couple in the mid-1990s.  See Lempitski Testimony at 20 (describing wedding gifts of between $2,500 and $5,000).  Again, the government has failed to account for any potential contribution from any of these sources to any of the questioned expenditures.  Instead, their calculations simply *assume* a total contribution of zero.  That assumption is insufficient to satisfy the government's burden in this proceeding.

**B.    The United States Has Failed to Establish that All of the Amounts Used in Connection with the Expenditures Represent Taxable Income**

Of course, even if the United States *could* establish with any precision the total amount of excess expenditures that considers appropriately the Defendant's beginning resources and the diminution of resources over time, its proof would fall short for a separate, but equally significant reason.  Specifically, the government has failed to produce evidence establishing that all of the Defendant's excess expenditures represent reportable income from the tax years in question.  When proceeding under a cash expenditures theory, the Government must not only adequately account for all of the Defendant's excess cash expenditures, it must also establish that the cash expenditures at issue were made with taxable income, rather than with money from another non-taxable source (such as gifts, loans or disposition of currently-held assets).  See Sutherland, 929 F.2d at 780 (explaining government's burden to show source of funds used in expenditures).

In this case, the Defendant has agreed that some portion of the expenditures were based upon taxable income.  Indeed, the Defendant has agreed that there is a tax loss in this case of between $30,000 and $80,000.  The United States and the PSR, however, go beyond this stipulation by simply assuming—without sufficient proof—that one hundred percent (100%) of the Defendant's expenditures represents unreported income.  That contention is simply not supported by the evidence submitted by the government.  Accordingly, the Defendant's objections to the tax loss calculations in the PSR are based in no small part upon this basic proposition.  See PSR at 40 ("Absent sufficient evidence regarding the source of the cash used in the expenditures, there is insufficient evidence to support the conclusion that all of those cash expenditures identified by the government represent taxable income.").  Curiously, the

Government's response to the Defendant's objections completely ignores this issue, and proceeds to assume that all of the expenditures were made with taxable income.[4]

In its submission to the Probation Office, the United States appears to suggest that the Defendant somehow earned the funds used in the expenditures through a supposed theft from the MBTA. At the same time, however, both the PSR and the Government specifically acknowledge there is insufficient proof to support the claim that the Defendant's expenditures were based upon any such theft. See PSR at 3, ¶ 13 (acknowledging that the Government "is unable to prove" these allegations). Accordingly, the evidence relating to that contention is necessarily insufficient to support the PSR's apparent conclusion that the information relating to that issue is somehow "relevant to the issue of whether the cash expended by the defendant in her purchases was in fact income which was required to be reported to the Internal Revenue Service." See PSR at 38.[5]

---

[4] For this reason, among others, the government's claim that the Defendant's objections to the PSR are somehow dependent upon a combination of three of her arguments is simply incorrect. See PSR at 32. Defendant's objections to the Guidelines calculation are premised upon a variety of assumptions reflected in the government's calculations for which the government has offered insufficient evidence in light of the significant evidentiary burdens placed upon the government in this type of cash expenditures case.

[5] Nor would consideration of such information be appropriate at this time, in light of both the government's explicit concession on this issue, as well as the United States' complete failure to produce to the Defendant in discovery any of the exculpatory information relating to this suggestion. Indeed, the Government's memorandum to the Probation Office of February 2, 2006, referenced a collection of exculpatory information regarding this issue that had not previously been provided to defense counsel. See PSR at 13, ¶ 56. Moreover, the United States has previously refused to produce to defense counsel information relating to an internal audit conducted at the MBTA in connection with this investigation, the results of which, according to the MBTA's public statements, indicated that "no revenue has been identified as missing." See Boston Herald, April 14, 2004 at p.30 (quoting MBTA spokesperson Joe Pesaturo). The United States' refusal to produce this information is possibly understandable in light of its conclusion that there is insufficient evidence to support a claim of embezzlement against the Defendant. But having reached that conclusion, the United States may not now turn around and assert that

Nor has the government adequately excluded all other potential non-taxable sources for the funds used in the expenditures.  As the PSR indicates, Ms. Lempitski has a large, local family with whom she is extremely close.  See PSR ¶¶ 85-91.  Indeed, for much of the relevant period, Ms. Lempitski resided at the same three-family home on Carolina Avenue in Jamaica Plain as several of her family members, including one of her four brothers, a cousin, and her mother.  See Testimony of Johanna Higgins at 11-12.  Despite this fact, the government appears to have limited its investigation of Ms. Lempitski's family to its questioning of Ms. Lempitski's ex-husband, one sister, and only one of her four brothers.  The government never bothered to interview or contact the remainder of her family—including those relatives who resided with her during most of the relevant period at the Carolina Avenue address.  Compare United States v. Sorrentino, 726 F.2d 876, 881 (1st Cir. 1984) (describing "exhaustive investigation" that satisfied government burden); see also DOJ Tax Manual § 31.05 (explaining requirement of thorough investigation).  While the few witnesses whom the government has questioned have indicated that they are unaware of any other sources of funds, the paucity of this investigation is insufficient to support the government's blanket claim that 100% of the expenditures are based upon taxable income.

### C.    The Evidence is Insufficient to Determine the Tax Year in Which Any Unreported Income was Earned.

The government's calculations also erroneously assume that the amounts reflected by any of the "excess expenditures" were actually earned during the year of the expenditures.  That suggestion is completely unsupported by the evidence in this case.  Under the federal tax laws, income is taxed when it is earned—not when it is spent.  See United States v. Boulet, 577 F.2d 1165, 1167-68 (5th Cir. 1978) ("It is part of the government's burden of proof to establish beyond

there is sufficient evidence to support  the conclusion that MBTA was somehow the source of the alleged expenditures in order to claim that those expenditures are income.

a reasonable doubt that the expenditures and deposits come from taxable income for the very year in question."); cf. Conoway, 11 F.3d at 44 ("[T]he government must establish the defendant's cash on hand at the beginning of each of the disputed years with reasonable certainty.")  In fact, it is logical to assume that any amounts that were spent may actually have been earned at some prior date or time.  The government however, has failed to present any evidence to support its apparent contention that the funds reflected by any excess expenditures should be taxed in the years in which they were spent.

To be sure, in any expenditure case, such calculations need not be perfectly precise.  See Taglianetti, 398 F.2d at 565.  But here the United States has made absolutely no effort to ascertain when the amounts in question were actually earned by the Defendant.  This is of particular concern in this case, where the government has failed to identify the Defendant's net worth at the starting point with any reasonable certainty, where it has failed to account for any diminution of the Defendant's assets over the relevant period, where it has failed to present evidence of a source of the alleged income, and where it has also made no effort to establish the Defendant's financial position at the start of any of the taxable years in question.[6]

**D.    The United States Has Failed to Disprove the Existence of the Defendant's Cash Hoard.**

The United States' tax loss calculations also fail to account adequately for evidence relating to cash hoards maintained by the defendant prior to and during the relevant period.  Specifically, two witnesses (MBTA Police Lieutenant Detective Mark Gillespie and MBTA Police Sergeant Robert Fitzsimmons) each testified before the grand jury that they had learned

---

[6] Nor is such an effort insignificant to the question of the tax loss at issue in this case.  The amount of income attributable to a particular has a direct impact upon the particular tax bracket and tax rate to be applied to any additional taxable income, and could likely result in a lower overall tax loss.

from the Defendant about a cash hoard of as much as $30,000 that the Defendant had maintained at her home during the relevant period. See generally Testimony of Mark Gillespie at 37-41; Testimony of Robert Fitzsimmons at 18-22. The United States contends that it has not considered the evidence regarding this cash hoard primarily on the grounds that it is based upon self-serving hearsay from the Defendant. See PSR at 33-36 (summarizing the government's position regarding the cash hoard described by Gillespie and Fitzsimmons). The Probation Office also concludes that the testimony of Gillespie and Fitzsimmons is "neither significant nor persuasive." See PSR at 41.

Once again, however, the United States' (and the PSR's) approach to this issue ignores well-established caselaw regarding the government's obligations and burdens in connection with an expenditures-based tax prosecution.[7] That caselaw requires the government to do more than merely disbelieve witnesses in order to disprove the existence of this cash hoard. Specifically, once this information regarding a cash hoard was disclosed to the government, the government was obligated to take reasonable steps to investigate these leads. See United States v. Hall, 650 F.2d 994, 1000 (9th Cir. 1981) ("When choosing to proceed against a defendant using the net worth or bank deposits method of proof, the Government assumes a special responsibility of thoroughness and particularity in its investigation and presentation.") (citing Holland, 348 U.S. at 135-36); accord United States v. Ludwig, 897 F.2d 875, 881 (7th Cir. 1990) (citing with approval jury instructions explaining that government has duty to investigate any leads "suggested to them by the defendant or which otherwise surfaced during the investigation concerning the existence of other funds") (emphasis added); cf. United States v. Terrell, 754 F.2d 1139, 1154 (5th Cir.

---

[7] Indeed, the United States even attempts to shift that burden improperly by suggesting that the Defendant should offer testimony regarding this hoard. See PSR at 35.

1985) ("In order to avoid the pitfalls of the net worth system, the Government must conduct a meticulous investigation, and the investigation techniques and figures are subject to close scrutiny."). Its failure to do so means that this Court should consider that hoard as having been established. See Hall, 650 F.2d at 1000. See also DOJ Criminal Tax Manual § 33.09 ("If the government fails to investigate a reasonable lead furnished timely by the defendant, the trial court may consider the defendant's version as true and so instruct the jury."); accord Sorrentino, 726 F.2d at 881 n.2 (citing same rule).

Here, there is little doubt that the United States failed to investigate adequately the leads regarding this $20,000 to $30,000 cash hoard. Those leads were provided to the government by Mark Gillespie and Robert Fitzsimmons on May 12, 2005. Specifically, on that day, Officer Gillespie testified that in approximately June 2001, long before the investigation of this matter, he had learned from the Defendant that she had saved approximately $20,000 to $30,000[8] in a cash hoard that she had maintained under her bathroom sink. See Gillespie Testimony at 38-39 "Q: Okay. [She told you] that she had slowly saved $30,000? A: That's what she told me. Q: Okay. And that she kept it under the sink in their bathroom? A: Yes. Q: And did she tell you where she got that money from? A: From her work, her paycheck.") Gillespie testified that the Defendant told him that she had initially been saving this money in order to buy her husband a motorcycle, but when their marriage had deteriorated, she had instead taken this cash with her when she had separated from her husband in mid-2000. Id. at 53-56. Gillespie further testified that he discussed this cash hoard with the Defendant again in early 2005. See id. at 42 ("We discussed it twice, once a while ago and then once within that [more recent] time frame, but it

---

[8] Gillespie's testimony regarding the amount is somewhat inconsistent. See Gillespie Testimony at 38 ("It could have been $20,000, but to the best of my recollection it was $30,000"); id. at 41 ("[W]hen I first heard about the money, I thought it may have been $20,000, but then recently, I'm pretty certain she said $30,000.").

was, it was brought up twice."). Fitzsimmons testified that he had learned about this same cash

hoard from the Defendant in mid-2003, shortly after the Defendant had been discharged from her

employment with the MBTA. See Fitzsimmons at 18-19 ("She told me that she had some money

saved up for a motorcycle that she was going to buy for her husband, and during the divorce

proceedings, she didn't declare that, and she kept the cash.").

Curiously, after receiving these leads from Gillespie and Fitzsimmons, the government

appears to have done <u>absolutely</u> <u>nothing</u> either to confirm or to disprove the existence of this

cash hoard. The United States appears to have conducted no search of the location where the

hoard was described. Nor did the government call Mr. Lempitski (or any other witness) back to

the grand jury to inquire about the specifics of the cash hoard described by Gillespie and

Fitzsimmons. The United States never even bothered to ask any of Defendants' numerous

family members or friends about the specifics of this cash hoard. Instead, the United States

appears to have ignored the testimony entirely—conduct that is flatly inconsistent with the

caselaw regarding cash expenditure cases.[9]  See Holland, 348 U.S. at 135-36; Hall, 650 F.2d at

999-1000; see also United States v. Lenamond, 553 F. Supp. 852, 855, 860 (N.D. Tex. 1982)

(setting aside conviction where agent failed to investigate lead where lead was available two

years prior to trial).[10]

---

[9] Perhaps the best evidence of the absence of any effort to investigate these leads is the fact that the Defendant was indicted at 4:00 p.m. on May 12, 2005, the <u>very same day</u> these leads were provided to the government and less than two hours after Fitzsimmons completed his testimony. See Gillespie Testimony at 104 (concluding at 12:50 p.m. on 5/12/06); Fitzsimmons Testimony at 36 (concluding at 2:22 p.m. on 5/12/06); Indictment at 8 (indicating execution time of 4:00 p.m. on 5/12/06).

[10] The only evidence cited by the United States and the Probation Office to rebut this evidence regarding a cash hoard is the financial affidavit filed by the Defendant in June 2001 in connection with her divorce, which does not reference the cash hoard. See PSR at 35. But the absence of any reference to the cash hoard in that divorce affidavit is not surprising, insofar as

In fact, not only did the government fail to investigate these leads, it also failed to disclose this evidence to defense counsel as required by the Rules of this Court. For reasons which remain unclear, <u>neither</u> Gillespie's testimony <u>nor</u> Fitzsimmons' testimony regarding the cash hoard was disclosed to defense counsel in connection with the government's automatic discovery disclosures, a blatant violation of Rule 16 of the Federal Rules of Criminal Procedure as well as Rules 116.1(C) and 116.2(B)(1) of the Rules of this Court. Instead, the government counsel specifically informed defense counsel that, other than several statements from witnesses who said that they never saw the Defendant with substantial amounts of cash, it was "<u>unaware of any other information</u> that would tend directly to negate the defendant's guilt concerning any count in the indictment." <u>See</u> Discovery Letter of June 2, 2005 from Assistant United States Attorney Emily R. Schulman to Daniel J. Cloherty at 6-7. Nor was any written summary of this evidence disclosed to defense counsel prior to the plea in this case on January 26, 2006—yet another violation of the Local Rules of this Court. <u>See</u> Local Rule 116.2(B)(4) (requiring Government to produce, before any plea, "[a] written summary of any information that tends to diminish the degree of the Defendant's culpability or the defendant's Offense Level under the United States Sentencing Guidelines"). In fact, the government improperly withheld this information until February 8, 2006[11]—<u>after</u> the Defendant had already plead guilty and after that

---

the leads provided by Gillespie and Fitzsimmons suggested that the money was hidden from the Defendant's ex-husband and was not declared in that affidavit. <u>See</u>, <u>e.g.</u>, Fitzsimmons at 14-15. Moreover, if the 2001 affidavit is to be treated as an authoritative statement regarding the Defendant's financial condition in 2001, it should also be used to measure the diminution of her personal assets during the relevant period in accordance with <u>Taglianetti</u>. Of course, as discussed above, <u>see</u> Section I.A. <u>supra</u>, the government has not even attempted in this case to comply with the requirements of <u>Taglianetti</u>.

[11] Defense counsel notes that current counsel of record for the United States, Assistant United States Attorney Paul Levinson, was not involved in this matter during the course of the grand jury investigation or the initial discovery disclosures. Rather, he substituted in as counsel of

guilty plea had already received substantial publicity.  Under these circumstances, the United

States' (and the PSR's) failure to account for the cash hoard is improper.

> **E.**     **The Government Has Failed to Submit Sufficient Evidence to Establish Certain of the Alleged Cash Expenditures.**

Finally, even assuming *arguendo* that the United States need not establish any opening

net worth and that it is entitled to treat *all* of the Defendant's expenditures as income earned on

the date of the expenditure, portions of the government's evidence suffers from a lack of basic

factual support.  Specifically, the United States has failed to establish beyond a reasonable doubt

that the Defendant actually made some of the alleged cash expenditures at issue.  Each of these

alleged expenditures is addressed briefly below.

> **1.**     **The Healthworks Expenditures**

The government's presentation includes $8,927.55 of alleged cash expenditures between

2000 and 2003 at Healthworks, Inc., a local health club.  In support of these alleged cash

expenditures, the government has cited to an "annotated statement of account activity" that

appears to have been reviewed and annotated by a Healthworks employee.  In many instances,

none of which are challenged by the Defendant, those annotations state "cash."  However, in four

instances (in October 2000, February 2001, April 2001, and May 2001), totaling $2,320,00, the

annotations state "unknown."  Accordingly, Defendant respectfully submits that the

Government's proof of these four expenditures is insufficient.

---

record shortly before the plea agreement.  In early February 2006—after the defendant's plea—
Mr. Levinson appears to have recognized the United States' failure to comply with its discovery
obligations in this matter, whereupon he produced to defense counsel the information regarding
Gillespie and Fitzsimmons (along with additional exculpatory information that had not
previously been produced).

###### 2.    The Two 2001 Bank Deposits

The government's calculations include a series of alleged cash deposits to the Defendants' bank accounts in 2001 through 2003.  Most of these alleged deposits are supported by cash deposit tickets signed by the Defendant.  Accordingly, the Defendant does not dispute many of these amounts.  In two instances, however, the government has failed to produce deposit tickets reflecting that the deposits were actually made by the Defendant and that they were made in cash.

Specifically, the government has failed to produce a cash deposit ticket for a $3,500 deposit to the MBTA Credit Union in July 2001.  While the Defendant acknowledges that the bank statement on the date of that alleged deposit reflects that the deposit may have been in cash, there is no actual deposit ticket reflecting that the Defendant made that deposit and the precise nature of the deposit.  This is in marked contrast to the records of the other deposits to that bank, all of which bear the Defendant's signature and which indicate the deposit is being made in cash.  Accordingly, that deposit should be excluded from any calculations of the Defendants' cash expenditures.

In addition, while the government has produced evidence of a deposit ticket that appears to include $1,700 deposited to the Hyde Park Cooperative Bank in August 2001, that deposit ticket does not indicate that the deposit was made in cash, rather than check or another source.  Nor is the government's citation to a January 7, 2003 letter from a Hyde Park representative is sufficient to support this claim.  That letter merely references the deposit ticket, which (as indicated above) fails to reflect that the deposit was in cash.  Accordingly, there is insufficient evidence to include that amount in the tax loss calculations.

## II

### THE OTHER APPLICABLE SENTENCING FACTORS INDICATE THAT A SPLIT SENTENCE IS APPROPRIATE IN THIS CASE

Of course, the PSR's calculations regarding the applicable Sentencing Guidelines range in this case is not controlling on this court.  Under <u>United States v. Booker</u>, 543 U.S. 220 (2005), sentencing courts must also consider the other factors described in 18 U.S.C. § 3553 in formulating an appropriate sentence.   Those various factors, when considered along with the above-discussion regarding the Sentencing Guidelines indicate that a split sentence involving only five months of imprisonment is more than sufficient to comply with the statutory purposes of seriousness, deterrence, and public protection.  <u>See</u> 18 U.S.C. § 3553.

### A.    <u>The Personal History And Characteristics of the Defendant.</u>

The PSR contains a detailed personal history of the Defendant.  <u>See</u> PSR ¶¶ 78-112.  That history reflects the fact that Ms. Lempitski has deep roots in the Boston community.  She is from a large local family, and has many close friends who reside in the metropolitan Boston area. Indeed, more than 30 letters from Ms. Lempitski's family and friends attesting to her personal character have been submitted to the Court under separate cover.  <u>See</u> Letters Submitted in Support of Defendant Mary Lempitski (hereinafter "Letters").  Many of these letters go into great detail regarding Ms. Lempitski's outstanding personal qualities.  <u>See</u> 18 U.S.C. § 3553(a)(1).

Not surprisingly, many of these letters are from Ms. Lempitski's large extended Boston-area family.  <u>See</u> Letters at Tab A.  Almost without fail, these letters describe Ms. Lempitski as kind, thoughtful, compassionate and hard-working individual who has already suffered greatly from the loss of her job and from the adverse publicity resulting from this case.  <u>Id. passim</u>. They also reflect that Ms. Lempitski taken responsibility for her conduct and is prepared to

accept the judgment of this Court.  See, e.g., id. Letter of James Naughton ("My sister Mary must now pay the consequences for her actions, and she is willing to do so."); Letter of Joanne Naughton ("[S]he is determined to take responsibility for this misstep"); Letter of Andrew Cloherty ("Mary has acknowledged the mistake she has made and has accepted responsibility for it"); Letter of Tom Naughton ("She knows there's a penalty to pay for this mistake and is courageously accepting that.").Letters Tab A, Letter of Alex Cloherty ("[S]he is fully aware that her mistake was not a minimal one.  In taking responsibility for her actions, Mary has chosen to acknowledge her mistake [and] to accept its consequences.").  Plainly, these letters describe an individual who has not minimized her conduct to her close friends or family.  A lengthy prison sentence is not needed to deter Ms. Lempitski from any further wrongdoing or to show her the error of her ways.

Ms. Lempitski's strong personal work ethic also shine through these letters—indicating that Ms. Lempitski has been a productive member of society who, if allowed to do so, will remain employed in an effort to satisfy her substantial tax obligations.  Indeed, while this case has been pending, Ms. Lempitski took a second part-time job in order to help maintain her current agreement with the Internal Revenue Service.  See PSR ¶¶ 106; see also PSR ¶ 110 (including monthly payment of $365 to IRS for liability arising from 2004 tax year).  Her current employer notes her "strong work ethic" and her "exemplary professional skills."  See Letters, Tab C (Letter of Joe Greene).  Her direct supervisor comments also comments on her strong work ethic.  See id. (letter of Raymond Gowing).  And a current colleague describes her as a "phenomenal co-worker" and "the first person people call when they need a helping hand and she's always there to give it."  See id. (Letter of Lisa Roberts).  Another friend tells of her efforts in connection with her second part-time job.  See id. Tab B (Letter of Shiela Mortali) ("Mary has

been tireless in helping our friend get her business off the ground, providing assistance with working in the shop, making deliveries, creating arrangements as well as providing immeasurable moral support.").

All of this information suggests that this Court need not impose a lengthy prison term for Ms. Lempitski.  To the contrary, a shorter term of imprisonment, which would allow the Defendant to maintain her contact with family and her current employers, is a more appropriate sentence in this case.  Indeed, such a sentence would likely facilitate Ms. Lempitski's ongoing and future efforts to pay her outstanding debts to the Internal Revenue Service.

**B.** **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, to Afford Adequate Deterrence and to Protect the Public.**

As this Court knows, Ms. Lempitski has never previously been charged with or convicted of any crime.  She has plead guilty and has acknowledged her responsibility for her offenses. She has already lost her job at the MBTA due to the investigation in connection with this case. In light of her conduct and her significant personal and family support network, there is no need a lengthy prison sentence to reflect the seriousness of the offense and to promote respect for the law.  A five month prison sentence for Ms. Lempitski would more than satisfy this statutory requirement.  See 18 U.S.C. § 3553(a)(2)(A).  Nor is a prison sentence longer than five months needed to afford adequate deterrence.  See 18 U.S.C. § 3553(a)(2)(b).

Indeed, the likelihood of any recidivism by Ms. Lempitski is extraordinarily low.  See 18 U.S.C. § 3553(a)(2)(C).  Throughout this investigation, and despite considerable financial strain, Ms. Lempitski has maintained her obligations to a payment plan with the Internal Revenue Service arising from her 2004 taxes.  See PSR ¶ 110.  After the conclusion of these proceedings, she has agreed to confer with the IRS regarding the additional amounts owed for the periods that

are the subject of this case.  See PSR ¶ 117.  A prison term of more than five months would serve only to delay these efforts, and undermine her ability to satisfy those additional financial obligations.

      **C.**    **The Kinds of Sentences Available**

Finally, a split sentence of five months in prison and five months of home detention is available to the Court in this case.  Ms. Lempitski has no prior offenses, and she is eligible to serve a portion of any sentence in home detention.   Moreover, as described in Section I supra, the applicable Sentencing Guideline range is 12, which under the Sentencing Guideline Range would result in a sentencing range within Zone C.  See U.S.S.G. § 5C1.1(d).  Finally, even if the Court concludes that the applicable range is 13, as recommended by the PSR, this Court may still impose a split sentence after consideration of the other factors under Section 3553.  See Booker, 543 U.S. at 756-66; United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (explaining that "Booker's remedial solution makes it possible for courts to impose non-guidelines sentences that overrule the guidelines, subject only to the ultimate question of reasonableness").

### III

### <u>CONCLUSION</u>

For all the foregoing reasons, Defendant respectfully requests that this Court enter a

sentence in this case of five months of imprisonment, followed by five months of home

detention.

Respectfully submitted,

/s/  Daniel J. Cloherty_____
Daniel J. Cloherty, Esq. (BBO #565772)
DWYER & COLLORA LLP
600 Atlantic Avenue
Boston, MA  02210
(617) 371-1000

*Attorney for the Defendant Mary E. Lempitski*

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 8, 2006 a true copy of the above document,  Defendant's
Sentencing Memorandum, was served upon Assistant U.S. Attorney Paul G. Levenson (in hand)
and U.S. Probation Officer Sean P. Buckley (by mail) on May 8, to the following addresses:

Paul G. Levenson
Assistant U.S. Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA  02210

Sean P. Buckley
U.S. Probation Officer
Probation Office
499 Essex Street
Lawrence, MA  01840

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 8, 2006.

/s/  Daniel J. Cloherty_____